U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

APR 2 5 2016

TONY R. MOORE CLERK
BY _____
                DEPUTY

UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| NICHOLAS COURVILLE | CIVIL ACTION NO. 1:14-CV-02190 |
| VERSUS | JUDGE TRIMBLE |
| KATHY RICHARDSON, et al. | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the Court is a civil rights complaint pursuant to 42 U.S.C. § 1983, with supplemental state law negligence claims, filed by plaintiff Nicholas Courville ("Courville") on June 25, 2014 (Doc. 1). The remaining defendants[1] are Kathy Richardson ("Richardson") (a nurse employed at the Winn Correctional Center ("WCC") in Winnfield, Louisiana) and Corrections Corporation of America ("CCA") (operator of WCC in 2014).

I. Background

Courville contends that, while he was incarcerated in the WCC in 2013, defendants denied him medication for his Hepatitis C and chronic kidney disease, which Defendants discovered in blood work done on April 18, 2013 and did not disclose to Courville. Courville contends he learned about his Hepatitis C and kidney disease on November 8, 2013, when he was admitted to LSU Health Center in Shreveport for fifth stage renal failure with less than 15% kidney function (Doc. 1). Courville's end-stage kidney disease was confirmed on November 21, 2013 (Doc. 1).

---

[1] Courville's action against the Louisiana Department of Public Safety and Corrections has been dismissed (Doc. 30).

Courville contends he has suffered irreversible damage to his kidneys due to defendants' failure to disclose and treat his kidney disease (Doc. 1). Courville seeks monetary damages, attorney fees, costs, and interest.

Defendants answered the complaint (Doc. 10) and filed a motion for summary judgment (Doc. 32). Courville responded to Defendants' motion (Doc. 36) and Defendants filed a reply (Doc. 37). Defendants' motion for summary judgment is now before the Court for disposition.

## II. Law and Analysis

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that the Court shall grant a summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Paragraph (e) of Rule 56 also provides the following:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order.

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there is a genuine issue to be tried.

2

In this regard, the substantive law determines what facts are "material." A material fact issue exists if a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. See Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), cert. den., 528 U.S. 906 (1999).

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the Court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, the Court reviews the facts and draws all inferences most favorable to the nonmovant. See Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment. See Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992), cert. den., 506 U.S. 825 (1992).

B. Eighth Amendment Medical Care Claim

Courville contends he was denied medical care for his Hepatitis C, hypertension, and chronic kidney disease ("CKD") while he was incarcerated in WCC. According to Courville, his Hepatitis C and CKD were discovered in April 2013 and left untreated, and he had end-stage renal failure by November 2013. Courville contends Defendants did not provide him with medication for his hypertension for a year, resulting in damage to his kidneys.

3

1. Law

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.   The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.   See Farmer v. Brennan, 511 U.S. 825, 832 (1994). Although the Eighth Amendment does not, by its precise words, mandate a certain level of medical care for prisoners, the Supreme Court has interpreted it as imposing a duty on prison officials to ensure that inmates receive *adequate* medical care.   See Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006) (citing Farmer, 511 U.S. at 832).   The fact that the medical care given is not the best that money can buy does not amount to deliberate indifference.   See Mayweather v. Foti, 958 F .2d 91 (5th Cir. 1992); Ruiz v. Estelle, 679 F.2d 1115, 1149 (5th Cir. 1982), amended in part and vacated in part on other grounds, 688 F.2d 266, 267 (5th Cir. 1982).

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." See Estelle v. Gamble, 429 U.S. 97, 106 (1976).   First, the deprivation must be, objectively, sufficiently serious and the prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities.   Second, a prison official must have a sufficiently culpable state of mind–i.e. deliberate indifference to a prisoner's constitutional rights–to be subjected to § 1983 liability.   See Farmer, 511 U.S. at 834. The Supreme Court defined "deliberate indifference" as "subjective recklessness," or, in other

words, a conscious disregard of a substantial risk of serious harm.  See Farmer, 511 U.S. at 839.

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  An official's failure to alleviate a significant risk that he should have perceived but did not, while not cause for commendation, cannot be condemned as the infliction of punishment.  See Farmer, 114 S.Ct. 1979; see also, Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999).

2. Evidence

In December 2012, Courville requested HIV and Hepatitis tests (Doc. 34-7, p. 5/32).  Courville tested positive for Hepatitis C on December 13, 2012 (Doc. 34-7, pp. 22, 29/32) and was referred to the Hepatitis Clinic (Doc. 34-7, p. 31/32).  On April 15, 2013, Richardson ordered daily blood pressure checks for Courville and blood work (Doc. 34-7, p. 18/32).  Dr. Kuplesky reviewed and initialed the lab test results that showed abnormal creatinine and BUN levels (Doc. 34/4, pp. 124-126/144).  On May 22, 2013, Lisinopril was re-prescribed for Courville's hypertension at Courville's request (Doc. 34-7, pp. 31-32/32).

On October 14, 2013, Courville went to the Chronic Care Clinic in WCC, where Richardson noted Courville's April 2013 lab results (Doc. 34-7, p. 16/32).  On

November 7, 2013, Richardson requested a consultation for Courville with the LSU Health Sciences Center (Doc. 34-7, p. 12/32) and Dr. Singleton recommended it (Doc. 34-7, p. 3232).  On November 8, 2013, Courville (then 31 years old) was admitted to LSU-Health Sciences Center for treatment of his CKD (Doc. 34-6, p. 3/40).  Courville had an elevated creatinine that was believed to be caused by having taken Disalcid (Salsalate) (Doc. 34-6, pp. 6-9/40).  On November 11, 2013, Courville was prescribed Sevelamer (Renvela) and Acetaminophen and was told to discontinue taking Ibuprofen, Lisinipril, and Salsalate (Disalcid) (Doc. 34-6, pp. 12-13/4).  On November 21, 2013, Courville underwent a kidney biopsy that showed acute interstitial nephritis, advanced vascular nephrosclerosis, and acute tubular injury with positive cocaine stain in the tubular epithelial cells (Doc. 34-6, pp. 27, 31/40).  On November 26, 2013, Courville was assessed with CKD V by Dr. Ramya Vejella (Doc. 34-6, p. 35/40).

Defendants submitted a deposition by Dr. Ramya Vejella, an internal medicine doctor with a subspecialty in nephrology who is employed at LSU Health Sciences Center in Shreveport (Doc. 34-5, p. 7/72).  Dr. Vejella testified that Dr. Zulqanain Abro (a nephrologist) is his supervising physician and that they were both consulting physicians for Courville (Doc. 34-5, pp. 9, 12/72).  Dr. Vejella testified that they, along with Dr. Karina Sulaiman as the attending physician and Dr. Kelly (the resident on the nephrology service), first saw Courville in November 2013 (Doc. 34-5, p. 10-11/72).  Courville was admitted through the emergency department (Doc. 34-5, p. 13/72).  Blood tests showed abnormal renal function with a creatinine serum level at 5.3

6

(normal range is .06-1.2) and a BUN (blood urea nitrogen) at 57 (normal range is 10-20) (Doc. 34-5, pp. 14-17/72). Dr. Vejella testified that Courville's blood test results would indicate to any medical doctor that further investigation was needed (Doc. 34-5, p. 17/72).

Dr. Vejella further testified that he was aware Courville had an elevated creatinine level in April 2013 (Doc. 34-5, p. 17/72). Dr. Vejella testified that a creatinine serum level of 3.9 and a BUN of 34 (from Courville's bloodwork in April 2013) were elevated beyond any doubt, but that lab values are interpreted based on the patient's condition at that point in time (Doc. 34/5, p. 18/72). Dr. Vejella testified that he does not know what Courville's condition was at that point, what his complaints were, or why he needed the lab work, and could only say that those elevated levels indicated a problem (Doc. 34-5, pp. 18-19/72). Dr. Vejella testified that, if Courville was already a kidney patient and had similar values in the past, perhaps because he had a chronic kidney disease and high values were normal for him, then ordering more tests would not be necessary (Doc. 34-5, p. 19/72). Dr. Vejella further testified that, if the elevated values were new for Courville, then he would have ordered further testing to find out what was going on (Doc. 34/5, p. 19/72). Dr. Vejella testified that such elevated creatinine and BUN levels appearing in a person for the first time would cause a reasonable medical professional to want to investigate them further (Doc. 34-5, pp. 19-20/72).

Dr. Vejella testified that creatinine levels measure kidney function because normally functioning kidneys excrete creatinine (which comes from muscle

breakdown), so it does not build up in the body (Doc. 34-5, p. 21/72).  An elevated
creatinine level indicates impaired kidney function and suggests possible kidney
disease (Doc. 34-5, p. 21/72).  Dr. Vejella testified that a person can live with just one
kidney, but the creatinine level could elevate depending on the person and how well
the one kidney was functioning (Doc. 34-5, p. 22/72).  If a person has two kidneys, the
creatinine level indicates the combined functioning of both kidneys and does not
indicate whether one kidney is functioning much better than the other (Doc 34-5, pp.
22-23/72).   An elevated creatinine level indicates that one or both kidneys are
impaired, but probably both (Doc. 34-5, p. 23/72).

Dr. Vejella testified that BUN (blood urea nitrogen) is from protein breakdown,
and an elevated BUN level is from excessive protein breakdown (Doc. 34-5, p. 23/72).
Nitrogen side products from protein breakdown are supposed to be excreted by the
kidney, so an elevated BUN (a buildup of nitrous toxins in the system) indicates
kidney impairment or disease (Doc. 34-5, p. 23/72).  Dr. Vejella pointed out that false
elevated creatinine and BUN levels may occur with normal kidney function, so more
has to be known about the patient before lab results can be properly interpreted (Doc.
34/5, p. 24/72).  However, elevated creatinine and BUN levels are red flags (Doc. 34-
5, p. 24/72).

Dr. Vejella testified that, in November 2013, once causes for elevated levels
such as dehydration were ruled out, a kidney biopsy was ordered (Doc. 34-5, pp. 25-
26/72).  Dr. Vejella first saw Courville in the ER, and next saw him when he had his
kidney biopsy (Doc. 34-5, p. 26/72).  Dr. Vejella testified that the biopsy showed injury

8

from cocaine use, injury from vascular nephrosclerosis[2] (possibly due to hypertension or due to cocaine use), and injury due to acute interstitial nephritis ("AIN") (inflammation) with eosinophils,[3] possibly due to taking an NSAID like Salsalate (which Courville was taking for back pain) (Doc. 34-5, pp. 26, 48-49/72).  Dr. Vejella testified that it was believed that Courville's kidneys were failing because of past cocaine use[4] and possibly also because of NSAID-induced kidney injury (Doc. 34-5, pp. 28-29/72).  Dr. Vejella testified that Courville had Stage V kidney disease (Doc. 34-5, p. 30/72).  Dr. Vejella testified that CKD, particularly with sclerosis, has a low chance of recovery because CKD is a progressive disease that eventually will lead to complete kidney failure requiring dialysis support or complete renal replacement therapy (Doc. 34/5, p. 30/72).

Dr. Vejella testified that ninety percent of kidney failure is caused by high blood pressure and diabetes, but there are some hereditary causes of kidney failure (Doc. 34-5, p. 36/72).  Dr. Vejella was not sure whether a cause of Courville's CKD was hereditary.

Dr. Vejella further testified that Courville has hypertension but, when he initially saw Courville, his blood pressure was fine (Doc. 34-5, pp. 36-37/72).  Dr.

---

[2] Hardening of the kidneys.

[3] White blood cells.

[4] Courville gave the doctor a history of extensive past cocaine use (Doc. 34-5, p. 46/72).  Dr. Velleja explained that the damage to Courville's kidneys caused by past cocaine use was not evidence that there was cocaine in his system at that time and that he was currently using or had recently used cocaine (Doc. 34-5, p. 47/72)..

Vejella testified that Courville's blood pressure has been well controlled since he has been treating him (Doc. 34-5, p. 37/72).

There are five stages to chronic kidney disease and that it is usually diagnosed in Stage III (Doc. 34-5, p. 45/72). Kidney function is called the GFR, so at Stage V the kidney function, or GFR, is less than 15 and the patient is close to dialysis (Doc. 34-5, p. 45/72). At Stage V CKD, kidneys start to give up, so the kidneys are assessed every month to decide whether dialysis is needed (Doc. 34-5, p. 46/72). Stage V kidney disease with sclerosis eventually progresses regardless of whether there is medical treatment (Doc. 34-5, pp. 30-31/72).

The progression of CKD varies with the person, and there is no way of knowing how long Courville has had CKD-Stage V or how long it will be stable or continue to progress (Doc.34-5, p. 31/72). Dr. Vejella testified there is a chance for slowing down the progress of the disease if it is treated early, in Stages I, II or III (Doc. 34-5, p. 32/72). However, CKD in Stages IV and V typically progresses because there is a high level of sclerosis (Doc. 34-5, p. 33/72).

Dr. Vejella testified there is no way to know what stage Courville's CKD was in April 2013, but he had a component of cocaine-induced nephrotoxicity which is partly responsible for his kidney failure and Dr. Vejella did not know when Courville last used cocaine (Doc. 34-5, p. 34/72). Kidney damage from cocaine use does not heal (Doc. 34-5, p. 24-25/72). Dr. Vejella found definite evidence that cocaine damaged Courville's kidney function at some point (Doc. 34-5, pp. 46-47/72).

Dr. Vejella further explained that Courville's February 5, 2015 lab report showed a GFR of 10, indicating that Courville's CKD was getting worse, but his last protein/creatinine ratio was .2 (Doc. 34-5, p. 49/72).  The protein-creatinine ratio is a measure of how much protein a person with CKD leaks out in a twenty-four hour period; a person with Hepatitis C will have a ratio of more than four, while a person with diabetes will have a ratio between two and four (Doc. 34-5, pp. 49-50/72). Courville's creatinine–protein ratio of .2 is normal, and that a higher number indicates a faster progression of CKD (Doc. 34-5, pp. 49-50/72).

Dr. Vejella also testified that Courville's father died from kidney disease so there could be a hereditary component in Courville's case, but it is difficult to determine the cause of CKD once it is at an advanced stage (Doc. 34-5, p. 35/72).  Dr. Vejella further testified that ninety percent of kidney failure is due to high blood pressure and diabetes (Doc. 34-5, p. 36/72).

Hepatitis C can cause kidney failure, but it would have been indicated in the kidney biopsy and his creatinine-protein ratio (which would have been more than 4) (Doc. 34-5, p. 51/72).  Dr. Vejella testified that there are certain changes in the kidney associated with Hepatitis C that are not present in Courville, so he does not think Hepatitis C is a cause of Courville's CKD (Doc. 34-5, p. 51/72).

Dr. Vejella sees Courville every month and that he has been stable for a few months (as of October 2015) (Doc. 34-5, pp. 38-39/72).  Dr. Vejella testified that, once Courville reaches the stage where he needs dialysis, he will need it indefinitely unless he receives a transplant (Doc. 34-5, p. 39/72).  A patient receiving hemodialysis has

dialysis three days a week and a nephrologist sees him (during dialysis) about once a week (Doc. 34-35, 39-42/72).

Dr. Vejella anticipates Mr. Courville needing dialysis in the near future, based on his test results and the progress of his CKD (Doc. 34-5, p. 44/72).

Defendants also submitted an affidavit by Dr. Ricky Hendrix, an internist with a nephrology practice (Doc. 34-3). Dr. Hendrix reviewed Courville's medical records from LSU Health Sciences Center, WCC, and Opelousas General Hospital, as well as the depositions of Dr. Vejella and defendant Kathy Richardson (Doc. 34-3). Dr. Hendrix noted that Courville's intake medical history at WCC in 2010 showed the past use of drugs, particularly cocaine, and that he tested positive for Hepatitis C in December 2012 (Doc. 34-3). Courville was placed in WCC's Hepatitis Clinic and first attended it on April 15, 2013, where he received additional testing and comprehensive blood tests (Doc. 34-4). Courville's April 2013 blood tests revealed a creatinine level of 3.91, which is considered indicative of kidney disease, and Kathy Richardson testified in her deposition that Dr. Kuplesky had reviewed the April 2013 test results (Doc. 34-3). Dr. Hendrix stated that Kathy Richardson testified in her deposition that she first reviewed the April 2013 lab results and GFR rate of 18 during Courville's visit to WCC's Hepatitis Clinic on October 14, 2013 (Doc. 34-3). A GFR of 18 is consistent with CKD, stage IV (Doc. 34-5). Richardson discussed the abnormal findings with Courville and ordered further tests in October and November of 2013 (Doc. 34-3). The lab called Richardson on November 7, 2013 to discuss Courville's

abnormal lab results, and Richardson immediately sent Courville to LSU Health Sciences Center for further evaluation on an emergency basis (Doc. 34-3).

Dr. Hendrix stated in his affidavit that the medical records show Courville told the LSU Health Sciences Center that he had used illicit drugs including cocaine, his last use of cocaine was in May 2013, he quit using tobacco in September 2013, and he had a strong family history of polycystic kidney disease[5] (Doc.34-3).   Courville's kidney biopsy showed "acute interstitial nephritis with scattered eosinophils," "acute tubular injury with positive cocaine stain in the tubular epithelial cells," and "cocaine induced nephrosclerosis with significant fibrosis and evidence of AIN [acute interstitial nephritis]" (Doc. 34-3).   Dr. Hendrix summarized the diagnosis and findings of the LSU Health Sciences Center as "far advanced Chronic Renal Disease, Stage IV more than likely secondary to a combination of long standing hypertension causing nephrosclerosis, with a likely component of drug abuse causing allergic interstitial nephritis" (Doc. 34-3).

Dr.   Hendrix concluded that nothing in the medical records contradicted Richardson's statement that she first learned of the April 2013 lab results during Courville's October 2013 Clinic visit.   Dr. Hendrix further stated that Richardson ordered additional testing and, upon learning of the new lab results, immediately and reasonably sent Courville to the LSU Health Sciences Center for additional evaluation (Doc. 34-3).   Dr. Hendrix also concluded that the medical evidence does

---

[5] Courville's medical records from LSU Health Sciences Center show Courville's father had kidney failure and underwent a transplant at age 34, and Courville's paternal sister and paternal grandfather also had kidney failure and required dialysis (Doc. 34-6, p. 14/40).

not suggest that Courville's mortality or medical condition were adversely affected by his not having been transferred from Winn to LSU Health Sciences Center for treatment in October 2013 instead of November 2013 (Doc. 34-3).

Defendant Kathy Richardson, a certified family nurse practitioner employed by Corrections Corporation of America ("CCA") at WCC in 2013 (Doc. 34-4, p. 13/144), stated in her deposition that Dr. Singleton was the physician employed at WCC in 2013, but he had taken time off for personal reasons (Doc. 34-4, p. 17/144).  Dr. Steve Kuplesky,[6] an internal medicine doctor, was filling in as a contract physician (Doc. 34-4, p. 17/144).  Dr. Kuplesky also had a private practice in Simmesport (Doc. 34-4, p. 17/144).  Richardson testified that Dr. Singleton normally worked five days a week at WCC (Doc. 34-4, p. 23/144).

Richardson testified there are two health care providers at WCC for 1560 inmates; half of the inmates see the doctor and half of the inmates see Richardson (Doc. 34-4, pp. 15-16/144).  Richardson testified there are also registered and licensed practical nurses at WCC (Doc. 34-4, p. 20/144).

Richardson testified that CCA has written Patient Care Protocols that are kept in a filing cabinet at WCC for the medical staff to follow in dealing with injuries and disease, and that only the doctor has the authority to deviate from the protocols (Doc. 34-4, p. 25/144).  Richardson testified that it was possible for Courville to have ingested cocaine while he was imprisoned in WCC because there are illegal drugs in the prison (Doc. 34-4, p. 32/144).  Richardson testified that, if inmates display

---

[6] Dr. Kuplesky passed away in September 2014.  See obituary at www.escudefuneralhome.com.

14

characteristics of being under the influence of drugs, they are drug tested (Doc. 34-4, p. 33/144).  Richardson testified that, before Courville was incarcerated, he was addicted to cocaine, methamphetamine, and I.V. heroine (Doc. 34/4, p. 33/144). Inmates who are addicts are not drug-tested any more often than inmates who are not addicts (Doc. 34-4, p. 33/144).  Richardson was unaware of Courville ever testing positive for drugs, but that she had seen him engage in drug-seeking activity (Doc. 34-4, p.  35/144).

Richardson testified that inmates under 50 years old are not given routine annual physical evaluations, and blood and urine tests are not given in the initial intake at WCC (except for a basic drug-screening urine test) (Doc. 34-4, p. 36/144). Courville had blood tests in April 2013 because he had requested testing for HIV and Hepatitis (Doc. 34-4, p. 39/144).  Courville tested  positive for Hepatitis C (Doc. 34/4, p. 41/144).  The doctor signed the lab test results and Richardson did not know if he discussed them with Courville (Doc. 34/4, p. 40/144).  Courville was told then that he had tested positive for Hepatitis C when he was called out for his initial visit to WCC's Chronic Care Clinic in October (Doc. 34/4, pp. 41, 54/144).  Richardson did not discuss Courville's abnormal lab results in April 2013 with him (Doc. 34/4, p. 42/144). Richardson that she knew the results of the Hepatitis test (because that's why Courville was called out for the Chronic Care Clinic), and the lab results would have been in Courville's chart which Richardson had access to, but she did not remember ever seeing it (Doc. 34/4, pp. 46-47/144).

Courville's lab test results were signed by Dr. Kuplesky, indicating he had seen them (Doc. 34-4, p. 47/144).  Richardson testified that Dr. Kuplesky was at WCC the day he reviewed Courville's lab test results (Doc. 34/4, p. 48/144).  Richardson testified that she did not know whether Courville was told of his lab test results before he went to LSU Health Sciences Center on November 8, 2013 (Doc. 34/4, p. 50/144).  Richardson testified that, when she see abnormal lab results, she calls the inmate out, sits him down and talks to him about it (Doc. 34/4, p. 51/144).  However, since Dr. Kuplesky reviewed the lab results (and signed them), Richardson does not know whether Dr. Kuplesky spoke to Courville about them (Doc. 34-4, p. 51/144).  It was customary to talk to inmates about abnormal test results (Doc. 34-4, p. 53/144).  Richardson testified that Courville's April lab results were elevated and she does not know why Dr. Kuplesky did not investigate further (Doc. 34-4, pp. 53-54/144).  Richardson testified that, if she had seen the April lab results in April 2013, she would have sent Courville to the LSU Health Sciences center for further evaluation (Doc. 34-4, p. 102/144).

Courville's kidney function was tested every six months due to his Hepatitis C, so he had lab work again in October 2013 (Doc. 34-3, pp. 96, 98/144).  Richardson saw the April lab results in October 2013 (Doc. 34-4, p. 105/144), but does not recall whether she spoke to Dr. Singleton about it at that time or whether she requested that Courville be sent to the LSU Health Sciences Center then (Doc. 34-4, p. 106-107/144).  Richardson testified that, when she saw Courville's abnormal lab results

from November 6, 2013, she spoke to Dr. Singleton about them and they agreed that Courville should be sent to LSU Health Sciences Center (Doc. 34-4, pp. 55-56, 73/144).

3. Nurse Richardson

Courville sued Defendants for failure to treat his CKD in April 2013, when he had his first abnormal lab results, which he alleges resulted in end-stage renal failure in November 2013. Courville alleges that failure to treat his Stage IV CKD in April 2013 allowed it to progress to Stage V CKD by October 2014. Courville contends that, if his CKD had been treated early, its progress could have been stopped and he would not need dialysis while he is in prison (Doc. 36). Courville also contends Defendants failed to treat his hypertension for a year after it was diagnosed in 2012, and that his hypertension is a cause of his CKD (Doc. 36).

Dr. Hendrix stated that Courville's CKD appeared to be in Stage IV in April 2013. Dr. Vejella testified that he did not know what state his CKD was in April 2013, but it was in Stage V in November 2013.

Dr. Vejella also testified that, although it is often possible to slow the progress of CKD at Stage III, CKD in Stages IV and V usually progress because there is a lot of sclerosis at that point (Doc. 34-5, p. 33/72). Therefore, according to Dr. Vejella, treatment of Courville's CKD in April, if it was in Stage IV, would not have prevented his CKD from progressing to Stage V and probably would not have slowed his CKD from progressing to Stage V.

Courville contends Richardson was deliberately indifferent to his serious medical needs when she failed to send him to LSU Health Sciences Center after his

April 2013 lab work indicated a possible kidney disease.  However, Courville failed to show that Richardson actually knew about his April 2013 lab results before October 2013.

Courville contends the Warden's response to his grievance (Doc. 1, Ex. 2) shows that Richardson (referred to as "LIP" in the response) reviewed Courville's April 2013 lab results in April 2013.  That contention is incorrect.  According to the affidavit of Daniel Marr, the Medical Director at WCC, "LIP" means licensed independent practitioner and is a term used by CCA to refer to either a doctor or a nurse practitioner (Doc. 40).  Marr stated that, in the Warden's response to Courville's grievance, "LIP" referred to Dr. Kuplesky, as indicated by Dr. Kuplesky's signature on the April 2013 lab results (Doc. 40).  Marr stated that LIP Dr. Kuplesky reviewed the April lab results in April, while LIP Richardson reviewed the April lab results in October (Doc. 40).  Therefore, the Warden's response to Courville's grievance does not show that Richardson reviewed Courville's April 2013 lab results in April 2013.

The evidence indicates that Richardson did not see the April 2013 lab results until she reviewed Courville's file in October 2013, when he first visited the WCC Chronic Care Clinic.  New blood work was ordered, Richardson saw those lab test results on November 7, 2013, and Courville was sent to the LSU Health Sciences Center on November 8, 2013.

Since Courville has not adduced any evidence to show that Richardson knew and ignored Courville's abnormal lab results in April 2013, Courville has not carried

his burden of proving Richardson was deliberately indifferent to his serious medical needs.

Courville also argues that, if had been given his hypertension medication when the doctor ordered it for him after he made an emergency sick call on May 5, 2012, instead of over one year later, he may not have had kidney damage from hypertension.  Courville contends he was unaware he had been prescribed medicine for hypertension until he was asked by then Medical Director Pat Thomas and Nurse Keffer why he was not taking his medication, to which he responded he was not supposed to be taking any medication (Doc. 36).  According to Courville, Nurse Keffer instructed Courville to write to Richardson about his hypertension medicine, resulting in Courville being called to the Chronic Care Clinic (Doc. 36).

The medical records show that, on April 15, 2013, Richardson ordered daily blood pressure checks for Courville (Doc. 34-7, p. 18/32).   On May 22, 2013, Richardson noted that Lisinopril (for hypertension) was *re-prescribed* for 6 months at Courville's request, and daily blood pressure checks were continued (Doc. 34-7, pp. 31-32/32).  On October 14, 2013, Courville's Lisinopril prescription was continued for six more months (Doc. 34-7, p. 30/32).

Courville contends he was initially prescribed blood pressure medication in May 2012.   The medical records before this Court indicate that Courville's hypertension medication was discontinued at some point (possibly April 15, 2013), but his pressure was monitored daily and his medication was reinstated at his request in May 2013.  If the blood pressure medication was initially prescribed in

May 2012 and later discontinued, possibly in April 2013, the evidence indicates that Courville was receiving, or at was least offered, blood pressure medication between May 2012 and April 2013. There is no evidence to support Courville's contentions that he was not provided blood pressure medication for a year, or that Richardson was deliberately indifferent to his serious medical need for blood pressure medication.

Although Courville blames Defendants for the damage to his kidneys, it is noted that the biopsy showed some apparent damage to Courville's kidneys caused by his cocaine use. Courville alone is responsible for that. Moreover, although Courville complains that he has to be treated for Stage V CKD while he is in prison, Courville is responsible for his misconduct that led to his imprisonment.

Since there are no genuine issues of material fact which preclude a summary judgment in favor of Richardson, Richardson's motion for summary judgment (Doc. 34) should be granted as to Courville's § 1983 claims.

4. CCA

Courville contends that CCA, (then) operator of WCC, is liable to him because it instituted a policy or custom of deliberate indifference to the serious medical needs of inmates (Doc. 1).

A corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies. Monell v. Dept. of Soc. Serv., 436 U.S. 658, 694 (1978). The test is whether there is a policy, custom, or action by those who represent official policy that inflicts injury actionable under § 1983. Id. at 694.

20

Courville does not allege a specific policy or custom of CCA that caused a deprivation of his constitutional rights, but only alleges acts and omissions by Richardson.  A corporation may not be sued under § 1983 for an injury inflicted solely by its employees.  The doctrine of *respondeat superior*, which makes an employer or supervisor vicariously liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. § 1983.  <u>Thompkins v. Belt</u>, 828 F.2d 298, 303 (5th Cir. 1987).

Since there are no genuine issues of material fact that would preclude a summary judgment in favor of CCA, CCA's motion for summary judgment (Doc. 34) should be granted as to Courville's § 1983 claims.

<u>C. State Law Claims</u>

Courville alleges state law negligence claims against Defendants for failing to inform Courville and "medical care providers" of the results of his April 2013 lab tests, failing to provide timely and adequate medical assessment and treatment from competent medical facilities and professionals, and failing to provide diagnostic and therapeutic medical care and treatment within the standard of care for healthcare professionals (Doc. 1).   Defendants did not address Courville's state law claims in their motion for summary judgment.

Although Courville has asserted the pendant jurisdiction of this Court, dismissal of Courville's § 1983 claims makes dismissal without prejudice of his state law claims proper.  District courts have "supplemental jurisdiction" over claims so related to a federal question "that they form part of the same case or controversy."  <u>See</u> 28 U.S.C. § 1367(a); <u>see also</u> <u>Rodriguez v. Pacificare of Texas, Inc.</u>, 980 F.2d 1014,

21

1018-19 (5th Cir.), cert. den., 508 U.S. 956 (1993); Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992).   The district courts may decline to exercise supplemental jurisdiction over a claim under §1367(a) if the district court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3); Rodriguez, 980 F.2d at 1018; Stephens v. LJ Partners, 852 F.Supp. 597, 600 (W.D.Tex. 1994); Holt v. Lockheed Support Systems, Inc., 835 F.Supp. 325, 329 (W.D.La. 1993).   In deciding whether to exercise supplemental jurisdiction, the court must consider judicial economy, convenience, fairness, and comity.  Metropolitan Wholesale Supply, Inc. v. M/V Royal Rainbow, 12 F.3d 58, 61 (5th Cir. 1994).  When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims.  Bass v. Parkwood Hosp., 180 F.3d 234, 246 (5th Cir. 1999) (citing Wong v. Stripling, 881 F.2d 200, 204 (5th Cir. 1989)).  See also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[J]ustification [for pendent jurisdiction] lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them.")

Since Courville's constitutional claims should be dismissed, it is recommended that the Court decline to exercise supplemental jurisdiction over Courville's state law claims and dismiss them without prejudice.

## Conclusion

Based on the foregoing. IT IS RECOMMENDED that defendants' motion for summary judgment (Doc. 34) be GRANTED and that Courville's § 1983 action be DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that Courville's state claims be DISMISSED WITHOUT PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have **fourteen (14)** days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14)** days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this

_25__ day of April 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge